May it please the court, my name is Larry Spong. I'm representing the government in this appeal. I would like to reserve one minute for rebuttal. Reasonable suspicion exists when a law enforcement officer is aware of specific articulable facts and the rational inferences drawn from those facts which reasonably warrant his suspicion that criminal activity is afoot. That's contrasted with an officer who has an inchoate suspicion or a hunch. If there was ever a case which demonstrates the difference between an officer operating on specific articulable facts and one operating on a hunch, this is that case. Agent Terragosa had an abundance of specific articulable facts for him to suspect that the appellee in this case was involved in criminal activity. The day before a person was arrested at the port of entry and confessed to smuggling narcotics, that person had evidence of his confederates on him in the form of pictures of the vehicles he was supposed to meet on his cell phone. Counsel, we of course have read your brief and know the facts of the case. I want to address your attention to Sgt. Seaman and the 45 minute detention based upon the traffic violation. Let's assume, arguendo, that your point is well taken about the agent himself. But the traffic violation in this case, a rosary that was on the, I guess, hanging from the mirror, it does not appear, at least based upon the facts as I see it, that that was in fact a violation of California Vehicle Codes 27, I'm sorry, 27. 2670882 because it didn't obstruct the person's view. Do you agree with that? No, Your Honor. In fact, the district court specifically credited the testimony of Sgt. Seaman at the hearing. And that testimony was very clear that he said he thought it obstructed the view. He noted that Villagrosa, the appellee in this case, was sitting low in the car. And that, in combination with that rosary block, in addition, he testified that in his position... But he's not citing him for sitting low. He's citing him for the fact that the rosary was obstructing his view, right? Correct. But where he was sitting in relation to that rosary is important as to whether it obstructed his view. Well, I think it is. It's whether it's obstructing the driver's view of the, that certainly is what it's directed at, is the driver's view. And as I said, the district court credited this testimony. But moreover... What deference do we owe the district court's crediting that? Well, number one, that she thinks it's credible. Credible determinations are for the district court. And then her finding of fact that it was obstructing is reviewed for clear error. I would note, however, if the court agrees that there was reasonable suspicion based on an extended border search... No, I understand. Then this is irrelevant. I just want to deal with this issue. I guess my point is, we'll want to focus on the other extended border search first. But I have real problem with this rosary issue, that that was a pretext for a stop. And so a 45-minute detention based upon a rosary is not very reasonable, I would suggest. And so my point to you was, where do we stand vis-a-vis this particular vehicle code session? Was that really, was there sufficient suspicion, reasonable suspicion in that case to warrant a stop on that basis? It certainly did to warrant a stop. That alone wouldn't warrant a 45-minute detention. I would agree with that. The government concedes that the 45-minute detention cannot be buttressed on the rosary stop alone. Alone. No, absolutely. That is, that there also had to be some suspicion of criminal activity. Do California peace officers routinely stop people for having rosaries? Do you have any conviction under California law for unlawfully displaying a rosary on your rearview mirror? I believe there was one case that we pointed out in our reply brief, Your Honor, where, excuse me, it wasn't a rosary, that was the air freshener. There's one case where an air freshener is and one isn't. I do not know of one where a rosary is. Now, surely we don't want to equate air fresheners and rosaries. I would just point out, there was one further piece of testimony here from Agent Siemens. That is, he himself, when he has driven cars with rosaries, removes it because he says it obstructs his view. All the testimony was that it did, in fact, obstruct the view. That is opposed to the case of People v. White, where the defense put on testimony that the particular object didn't. Here, there was nothing to say that it didn't. But you agree that the 45-minute detention, even if there were reasonable suspicion to stop the vehicle based upon the display of the rosary from the mirror, was not sufficient to warrant the 45-minute detention? Alone. Alone. Absolutely, because I think the law is clear that when you stop for a vehicle violation, you can ask questions, but once that violation is taken care of, then the time stops and you have to have something else. Okay, so what's the something else here? Well, the something else here is the fact that this car was identified, not by an anonymous tipper, but by a criminal insider with knowledge of the operations of this criminal enterprise. But did the officer have any reason to believe that there were drugs on this car? Yes, he did. Why? Not because he was a confidential informant, because his confidential informant told him that this was the scout car, not the load car. It was going to be operating as a scout car on that day, but the officer testified, and it's uncontradicted, that in his experience, cars that are used as scout cars on one day can be used as load cars on another. But the fact that it was a scout car doesn't vitiate reasonable suspicion. It's not reasonable. The test is, in an extended border search, whether reasonable suspicion that the search may uncover contraband or evidence of criminal activity, even if, let's assume he even knew and he didn't know about the negative search. Just clarify something for me, because something's confused my mind. If this is an extended border search, then does he have to have the Sergeant Seaman stop him? No. He can just stop him on his own? Stop him on his own, absolutely. That's what I'm saying. The government's position is the stop by Sergeant Seaman, he did that in order to protect himself. It was purely pretextual. Right. Well, it was pretextual in the sense that he was stopped for, the reason he was stopped was he was going to be stopped no matter what, based on reasonable suspicion. Yes, that's true. It wasn't pretextual in that there was nothing to pull him over for, but the fact of the matter, I mean, there was a violation. But regardless, the test is reasonable suspicion that contraband or evidence of criminal activity will be found as a result of the search. But getting back to Judge Bivey's question, if you had a clear chain from the confidential informant to an identified car going forward, then that's one thing. But here the confidential informant referred to a different function for the car that he was observing. He didn't say, did he, that there were going to be drugs in the car that the agent observed? No, not on the day before. What about this car? What did the confidential informant say about this car? Well, the testimony is a little ambiguous. When you read the actual testimony today, it says he had these two cars. The owner of a white pickup was the owner. And then it said, and he's always with him, meaning the PT cruiser. And it's unclear that, and then he says, they were going to show me where to take the drugs. From that, we assume that he is referring to the owner. Isn't this equivalent to a chain of custody issue in terms of traditional evidence things? If you can't show that somebody held this and they give it to somebody else and it's now in the court, you've got to show where it came from. And isn't there a problem in the government's case that there is no, if you will, chain of custody in terms of the information that came from the confidential informant about the car that actually crossed that day? No, Your Honor, because we don't, whether or not, even assuming that we know for sure on that day that it's only a guide vehicle, there's still reasonable suspicion to search. It's not just searching for contraband. It's reasonable suspicion to search for contraband or evidence of criminal activity. This is a confederate of a known drug smuggler. There is lots of other evidence that might be relevant. For example, other confederates. Where, in fact, the stash house was going to be, that evidence might be in that car. There's a whole world of evidence that might be in there for which reasonable suspicion existed. So whether or not that, you know, the person said that's a load car or not would be irrelevant under the test. If the officer had known that it had already passed secondary, would he still have been entitled to stop the car? Yes, because, again, the test is reasonable suspicion of contraband or Well, how many times did he get to stop the car? Well, he certainly gets to stop it on an extended board of search. There's at least three cases in this in this circuit that say that an initial search at the border does not vitiate the extended border search later. And there are good policy reasons why. But you've got to have two strikes against you, though. You've got both. Even though you say there's no attribution to your agent that the dog had sniffed this car, not pick it up at the border. Then you don't have a direct connection between what the confidential informant said, tying it to the drugs to this car. So you really got two disconnects there. Isn't that very harmful to the government's case? No, Your Honor. And I guess I can only repeat the fact that the person who was stopped pointed out that this is a load car doesn't hurt our case for two reasons. What was a guide car? One, the testimony is cars are used as both guide and load cars. Second, even if Terragosa believed it didn't have, let's assume he actually believed, reasonably believed even, it didn't have contraband. He reasonably believed it could have evidence of criminal activity. That's the test. And there could have been an abundance of evidence of criminal activity. As I said, locations of stash houses, identification of others, all of that. And so that is what justifies him, even had he known of that negative search at the border. Thank you. Okay. Bertram. Your Honors, good morning. Gary Bertram for Appellee Jose Villasenor. If I may, I'd like to continue on this discussion about this second possible basis for suspicion. Number one, that the car contained narcotics. Number two, that the car might have been involved in some illegal activity. Well, let's look at what happened when the car crossed the border. The person went to the Pilco station. He waited there for a few minutes. Then the car went to the AMPM station. He waited there for a few minutes. And the entire time that the agents were following this car, they never saw another car driving in tandem. They never saw Mr. Villasenor following another car. Then the car went from the AMPM gas station to the DMV in El Centro again. They followed the car. What was the distance from the AMPM to El Centro? It's about 10 to 12 miles. A little bit less, I think 8 to 10 miles. And, again, they followed the car. So if they're looking for this other illegal activity, there was absolutely none. Was there any evidence admitted as to why he went into the DMV? Was he going to use the water fountain, use the bathroom, make a phone call, picking up registration papers, something? There was not. The evidence in the case said that he left his car unattended in the parking lot, walked into the DMV for approximately, I think, 4 to 5 minutes, and then came out, got back in his car, and drove away. And, again, there's no evidence that from the time he was first seen right at the border up until the time he was stopped. But, Counselor, you're really basing this on attenuation here. I mean, let's just say, I know you don't think this is the case, but let's just say hypothetically that the confidential informant said, this car is coming across the border, it contains narcotics, and this is the license number, and it came across the border and did all the things that you talked about and was eventually stopped. There would be no problem with that would there? That would be closer to the Spiroquai to Reyes case, which is discussed at length in the briefs. Right. But as Your Honors have noted earlier on in the argument, that's an important distinction that was made in this case and was relied upon. The real tension here is not the fact, at least in my mind, that he went to these various spots using a cell phone and all that sort of thing and took as much time as he did, but the fact that you've got somewhat of a disconnect with the confidential informant, whatever the implications are with the previous search by the dog at the border, and what seems to be clearly a pretextual stop by a local police officer in connection with the rosary. Those are the problems in this case, aren't they? Not the fact that you have this attenuated stopping. I agree with you, Your Honor, but I'll simply respond to the government's argument. It's not just whether the car contains narcotics, it's whether the car is involved in illegal activity. And there's not a single thing that the government can point to once he crossed the border that gave any indication that he was involved in this action. Right. In other words, if you just took that in isolation, if there were no confidential informant, there would be nothing that Mr. Villaseñor did from the time he left the border until he was ultimately picked up that would constitute reasonable suspicion. That's what you're saying, right? Exactly, Your Honor. And so the government's really two classes of evidence. Number one, the evidence from the cooperating defendant. Number two, his actions after he crossed the border. We would submit that those don't establish any suspicion whatsoever. But then when we factor into the analysis the evidence that cuts strongly against reasonable suspicion, we submit this isn't even a close call. First of all, the search at secondary. Agent Torregrossa knew the car had been searched at secondary. On page 77 of the ER, during the evidentiary hearing, he said that when he saw this white car, he called up his partner, the other special agent, Special Agent Worgen, and says, I've got this car. Did you put the text in? And Agent Worgen said yes. At that point, he knew that the car had been in the secondary. Well, he didn't know it had been in the secondary. He strongly suspected that it had been in the secondary. If all the procedures were followed, then it should have been inspected at secondary. Exactly. Unless there was some problem with the text system and the car wasn't referred, it had been to secondary. He didn't know whether that included a dog sniff or not. But the thing I find amazing in this case is he talks about the 10 minutes at the Philco when V.S. Pignor was on the telephone and he was in the bathroom, the five minutes at the a.m. p.m. when V.S. Pignor was on the telephone. Why not get on the phone, call to the secondary office, find out what happened when that car crossed the border? I can't believe that Torregrossa didn't call the border. Are we to impute to the officer the knowledge that it has been through secondary and that it has passed its test? Absolutely. Absolutely. We're talking essentially about one investigation in this case. The first part of the investigation was the information provided by the cooperating defendant. That information is given to these special agents who put it into the computer. That computer then – Would that be true, counsel, if the officer had not been – was not involved in interviewing the C.I. and known that? Let's suppose that somebody has submitted sort of a general bulletin and sent it out on Twitter or something that said we're looking for a white PT cruiser. If anybody sees one, let us know because we think somebody may be coming in. So he didn't have any direct information. Would we still impute to him the secondary inspection and the fact that it had passed? As long as he's an agent working at that port of entry, I think so. I think that's a fair – Sort of a collective knowledge – Exactly right. Do you have any case law that would substantiate your position? Well, the case law that I cite is the sort of general case law that says when officers are part of the same investigation, information from one officer is imputed to another officer, and generally that happens when the information is favorable for the government. That often does favor – In this case, it's actually favorable for Mr. Villasenor. But so the first part of the investigation is putting the information into the text system. The second part of the investigation is that automatic referral to secondary based upon that information, and that's where the secondary inspection occurred and where the dog sniff occurred. The third part of the investigation is when the car crosses the border. So we essentially have a full circle with the agent who started the investigation being the same agent who was the one who made the stop in the arrest of Mr. Villasenor. So I think there's no distinction between the cases that have found collective knowledge and what happened in this case. This is one investigation of one vehicle started and finished by the same officers. I have three minutes remaining. If the Court has any further questions about this, I'll answer those. If not, I'll submit the case. Thank you. Thank you. Mr. Spong, I'll give you a minute to respond. Thank you, Your Honor. I guess three quick points. One, I think our arguments about Ramirez in the reply brief make it clear that collective knowledge does not apply here. Number two – But that doctor usually does benefit the government, doesn't it? Usually does benefit the government, but we couldn't have used it here. That would be my point. We could not have used it here. Well, the fact that you couldn't have benefited from it doesn't mean that you shouldn't bear the burdens of the doctrine. Oh, absolutely. But this isn't one of those cases. There has to be at least some communication, as we point out. I think the name is Terry Crespo. The case there says there has to be at least some communication. I would also point out that this person didn't just go to the Philco station and then leave a few minutes later. He, on his cell phone, walked out and stared right back at the port of entry, which is about 200 yards in front of him. He acted completely consistently with the information that was provided. And finally, I would just say that whether or not he – this individual said this would be a load car or a guide car should not be – should be on a totality of the circumstances. Certainly we don't want to let Confederates go at the border simply because one of their co-Confederates says he was a guide, not a load. But you do agree, I gather, that what Mr. Villasenor did from the time he crossed the border until he was picked up, had there been no confidential informant, would have been – would not have generated reasonable suspicion. Do you agree with that? I don't. You don't? I don't. Why is that? Why is that? Because let's assume he just pulled in behind this guy and sees this person go to a place he knows that it's being used, notorious for swapping cars. What does he see? He sees a guy get out of his car, doesn't get gas, gets on his cell phone, walks back and stares at that port of entry on his phone. What is he doing? He's waiting for somebody to – He went to the bathroom, too, didn't he? He's 82 years old. Maybe his Flomax is working. I don't know. The reality is, you know, this is not unusual stuff. No, the reality is that a seemingly innocent behavior under – in an unusual place and under unusual circumstances is, and this is because this is a – this place was famous for swapping cars. It's at the border. He's standing there looking. He's waiting for a load vehicle. When Judge Bivey goes to that same place and is looking at the border, waiting for his wife to come across, that constitutes reasonable suspicion? No, not that – not in and of itself. But then he continues on and continues to act as if he's trying to meet someone waiting to go. I mean, it would be close, maybe not reasonable suspicion. But once he's traveling and traveling and on his phone, he's going to businesses, but he's not conducting any business appropriate to that business. He's always on the phone. He's clearly looking to meet up. And he's doing it at two different gas stations that agents know are notorious for people swapping out vehicles. It's not just he came across the border at San Ysidro where there's lots of businesses. He went to very particular places. Sounds like 1984. No, Your Honor. George Orwell would love this stuff. No, Your Honor. I don't believe it is. But certainly when you look at the informant's information combined with that, this is a case where there's reasonable, articulable facts. It's not a hunch. Okay. We thank both counsel for the argument in Villasenor, and that case is order submitted. The next case on the docket is United States v. Alvarez.
judges: Nelson T. G., Bybee, Smith M.